PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

| | |
|---|---|
| ESTELA LEBRON, for herself and as Mother and Next Friend of Jose Padilla; JOSE PADILLA, <br><br> *Plaintiffs-Appellants,* <br><br> v. <br><br> DONALD H. RUMSFELD, Former Secretary of Defense; CATHERINE T. HANFT, Former Commander Consolidated Brig; MELANIE A. MARR, Former Commander Consolidated Brig; LOWELL E. JACOBY, Vice Admiral, Former Director Defense Intelligence Agency; PAUL WOLFOWITZ, Former Deputy Secretary of Defense; WILLIAM HAYNES, Former General Counsel Department of Defense; LEON E. PANETTA, Secretary of Defense in his official and individual capacities, <br><br> *Defendants-Appellees,* <br><br> and | No. 11-6480 |

John Ashcroft, Former Attorney General; Michael H. Mobbs, Special Advisor to Undersecretary of Defense for Policy; John Does, 1-48, in their individual capacities; Mack D. Keen, Senior Chief Consolidated Brig; Craig Noble, Dr.; Sandy Seymour, Technical Director Consolidated Brig; Stephanie L. Wright, Commander Consolidated Brig,

*Defendants.*

James P. Cullen, Brigadier General, USA (Ret.); Morris D. Davis, Colonel, USAF (Ret.); Eugene R. Fidell, Lieutenant Commander, USCG (Ret.); Evelyn P. Foote, Brigadier General, USA (Ret.); Don Guter, Rear Admiral, JAGC, USN (Ret.); Leif H. Hendrickson, Brigadier General, USMC (Ret.); John D. Hutson, Rear Admiral, JAGC, USN (Ret.);

DAVID R. IRVINE, Brigadier General, USA (Ret.); CLAUDIA J. KENNEDY, Lieutenant General, USA (Ret.); MERRILL A. McPEAK, General, USAF (Ret.); RICHARD O'MEARA, Brigadier General, USA (Ret.); CHARLES OTSTOTT, Lieutenant General, USA (Ret.); THOMAS J. ROMIG, Major General, USA (Ret.); STEPHEN N. XENAKIS, Brigadier General, USA (Ret.); ERWIN CHEMERINSKY, Founding Dean University of California-Irvine School of Law; NORMAN DORSEN, Frederick I. and Grace A. Stokes Professor of Law and Co-Director, Arthur Garfield Hays Civil Liberties Program New York University School of Law; DAVID GOLOVE, Hiller Family Foundation Professor of Law New York University School of Law;

LEE B. KOVARSKY, Assistant Professor University of Maryland School of Law; ALAN B. MORRISON, Associate Dean for Public Interest and Public Service George Washington University Law School; SHELDON H. NAHMOD, Distinguished Professor of Law and Co-Director of the Institute for Law and the Humanities Chicago-Kent College of Law; ALEXANDER REINERT, Associate Professor of Law Benjamin N. Cardozo School of Law; KERMIT ROOSEVELT, III, Professor of Law University of Pennsylvania Law School; MICHAEL E. TIGAR, Professor of the Practice of Law, Emeritus Duke University School of Law; CARL W. TOBIAS, Williams Professor of Law University of Richmond School of Law;

WILLIAM VAN ALSTYNE, Lee
Professor of Law William & Mary
Law School; STEPHEN I. VLADECK,
Professor of Law American
University Washington College of
Law,

    *Amici Supporting Appellants,*

WILLIAM P. BARR; EDWIN MEESE,
III; MICHAEL B. MUKASEY; DICK
THORNBURGH; UNITED STATES OF
AMERICA,

    *Amici Supporting Appellees.*

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Richard M. Gergel, District Judge.
(2:07-cv-00410-RMG)

Argued: October 26, 2011

Decided: January 23, 2012

Before WILKINSON, MOTZ, and DUNCAN,
Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Motz and Judge Duncan joined.

## COUNSEL

**ARGUED:** Benjamin Elihu Wizner, AMERICAN CIVIL
LIBERTIES UNION, New York, New York, for Appellants.
David Boris Rivkin, BAKER & HOSTETLER LLP, Wash-
ington, D.C.; Richard Douglas Klingler, SIDLEY AUSTIN,
LLP, Washington, D.C., for Appellees. **ON BRIEF:** Alexan-
der A. Abdo, AMERICAN CIVIL LIBERTIES UNION, New
York, New York; Jonathan Freiman, Hope R. Metcalf, Tahlia
Townsend, ALLARD K. LOWENSTEIN INTERNATIONAL
HUMAN RIGHTS CLINIC, National Litigation Project, Yale
Law School, New Haven, Connecticut; Michael P. O'Connell,
STIRLING & O'CONNELL, PA, Charleston, South Carolina,
for Appellants. Lee A. Casey, Darin R. Bartram, Andrew M.
Grossman, BAKER & HOSTETLER LLP, Washington, D.C.,
for Appellee Donald H. Rumsfeld. Frank Gregory Bowman,
Edward C. Reddington, WILLIAMS & CONNOLLY LLP,
Washington, D.C., for Appellee William J. Haynes II; Jacque-
line G. Cooper, SIDLEY AUSTIN LLP, Washington, D.C.,
for Appellee Catherine T. Hanft; William A. Coates, ROE
CASSIDY COATES & PRICE, P.A., Greenville, South Caro-
lina, for Appellee Melanie A. Marr; Wan J. Kim, Kevin B.
Huff, Andrew S. Oldham, KELLOGG, HUBER, HANSEN,
TODD, EVANS & FIGEL, PLLC, Washington, D.C., Henry
L. Parr, Jr., WYCHE, P.A., Greenville, South Carolina, for
Appellee Lowell E. Jacoby; Paul W. Butler, Kevin R. Amer,
AKIN, GUMP, STRAUSS, HAUER & FELD, LLP, Wash-
ington, D.C., Ruth Wedgwood, Washington, D.C., for Appel-
lee Paul Wolfowitz. Michael F. Hertz, Deputy Assistant
Attorney General, Barbara L. Herwig, August E. Flentje,
UNITED STATES DEPARTMENT OF JUSTICE, Washing-
ton, D.C., for Appellee Leon E. Panetta. Eric L. Lewis, James
P. Davenport, Chiara Spector-Naranjo, Waleed Nassar,
BAACH ROBINSON & LEWIS PLLC, Washington, D.C.,
for Retired Military Officers, Amici Supporting Appellants.
Stephen I. Vladeck, Washington, D.C.; Armand Derfner,
DERFNER, ALTMAN & WILBORN, Charleston, South Car-
olina, for Constitutional Law and Federal Courts Professors,

Amici Supporting Appellants. Andrew G. McBride, William S. Consovoy, Claire J. Evans, WILEY REIN LLP, Washington, D.C., for Former Attorneys General William P. Barr, Edwin Meese, III, Michael B. Mukasey, Dick Thornburgh, Amici Supporting Appellees. Michael F. Hertz, Deputy Assistant Attorney General, Barbara L. Herwig, Robert M. Loeb, August E. Flentje, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for the United States, Amicus Supporting Appellees.

---

**OPINION**

WILKINSON, Circuit Judge:

Plaintiffs Jose Padilla, presently incarcerated due to his conviction after trial for federal crimes of terrorism, and his mother, Estela Lebron, sue for legal and equitable relief based on Padilla's prior military detention as an "enemy combatant." Padilla names as defendants the present Secretary of Defense and a number of former high-level civilian policymakers in the Defense Department, as well as military officers who implemented their orders. He seeks a declaration that defendants' policies were unconstitutional, an order enjoining his future designation as an enemy combatant, and nominal damages of one dollar from each defendant. The district court dismissed the action. For the reasons that follow, we affirm.

I.

A.

Plaintiff Jose Padilla is a United States citizen and a member of al Qaeda, who has been an active participant in that organization's terrorist mission since at least the late 1990s. He stands convicted of conspiring with others within the United States to support al Qaeda's global campaign of terror,

having travelled to Afghanistan in late 2000 to receive combat training at al Qaeda's al Farooq jihadist camp.

After al Qaeda killed over three thousand people in its September 11, 2001 attacks on the United States, Congress empowered the President to use his warmaking authority to defeat this terrorist threat to our nation. *See* Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001) ("AUMF"). Two administrations have and continue to act pursuant to this authority. *See* Harold Hongju Koh, Legal Adviser, U.S. Department of State, Address to the Annual Meeting of the American Society of International Law: The Obama Administration and International Law (Mar. 25, 2010) ("[W]e continue to fight a war of self-defense against an enemy that attacked us on September 11, 2001, and before, and that continues to undertake armed attacks against the United States.")

While the U.S. military was engaged in combat against al Qaeda and its allies in Afghanistan, Padilla orchestrated his return from Afghanistan to the United States via Pakistan, Egypt, and Switzerland, ultimately arriving at Chicago's O'Hare International Airport on May 8, 2002. There, Padilla was arrested by FBI agents after falsely denying that he had ever visited Afghanistan. Held pursuant to a material witness warrant issued by the U.S. District Court for the Southern District of New York, Padilla was transported to a federal detention center in New York and assigned court-appointed counsel.

On June 9, 2002, acting pursuant to his authority under the AUMF, President George W. Bush issued an order to defendant Donald Rumsfeld, then Secretary of Defense, to detain Padilla as an enemy combatant, the President having determined that Padilla possessed vital intelligence and posed an ongoing threat to the national security of the United States. That day, Padilla was removed from civilian custody and transferred to the Naval Consolidated Brig at Charleston,

South Carolina. While in military custody, Padilla claims that he was repeatedly abused, threatened with torture, deprived of basic necessities, and unjustifiably cut off from access to the outside world. Over time, these conditions were relaxed, and he was allowed monitored meetings with his attorneys.

On November 17, 2005, Padilla was indicted on criminal terrorism charges in the Southern District of Florida. The Supreme Court authorized his transfer from the Naval Consolidated Brig into civilian custody on January 4, 2006. *See Hanft v. Padilla*, 546 U.S. 1084 (2006). On August, 16, 2007, Padilla was convicted after trial of one count of conspiracy to murder, kidnap, or maim persons overseas in violation of 18 U.S.C. § 956(a)(1) and two counts of providing material support to al Qaeda in violation of 18 U.S.C. § 2339A. He is presently serving his sentence for those crimes.

B.

Since his 2002 detention, Padilla has received the regular attention of the federal courts. Two days after Padilla's transfer to military custody, on June 11, 2002, Padilla's counsel filed a petition for a writ of habeas corpus in the Southern District of New York, challenging that detention. *See Padilla v. Bush*, 233 F. Supp. 2d 564 (S.D.N.Y. 2002) ("*Padilla I*"). The district court denied the petition, upholding the President's authority to detain Padilla, but a divided panel of the Second Circuit reversed. *See Padilla v. Rumsfeld*, 352 F.3d 695 (2d Cir. 2003) ("*Padilla II*"). The Supreme Court vacated *Padilla II*, ruling that Padilla's petition should have been filed in South Carolina where he was being held. *See Rumsfeld v. Padilla*, 542 U.S. 426, 451 (2004) ("*Padilla III*").

On July 2, 2004, Padilla refiled his habeas petition in the District of South Carolina. The district court granted Padilla's petition, holding that he could not be detained as an enemy combatant because he had been captured in the United States. *See Padilla v. Hanft*, 389 F. Supp. 2d 678 (D.S.C. 2005)

("*Padilla IV*"). This court reversed, upholding the President's authority to detain Padilla under the AUMF. *See Padilla v. Hanft*, 423 F.3d 386 (4th Cir. 2005) ("*Padilla V*").

Approximately two months after this decision, while Padilla's petition for certiorari to the Supreme Court was pending, the government unsealed the indictment in the Southern District of Florida and petitioned this court to vacate its prior opinion and authorize Padilla's removal into civilian custody. When this court denied the government's request, *see Padilla v. Hanft*, 432 F.3d 582 (4th Cir. 2005) ("*Padilla VI*"), the Supreme Court directly authorized the transfer, *see Hanft v. Padilla*, 546 U.S. 1084 (2006) ("*Padilla VII*"). The Supreme Court ultimately denied certiorari on Padilla's habeas claim, concluding that such a constitutional challenge to Padilla's military detention presented no live case or controversy once he had been transferred to civilian custody. *See Padilla v. Hanft*, 547 U.S. 1062 (2006) ("*Padilla VIII*").

While a wide range of issues were subsequently litigated in Padilla's criminal case, the only decision relevant to this appeal is *United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011), which affirmed Padilla's conviction on terrorism charges, but reversed the district court's sentence, concluding that 208 months' incarceration was unreasonably low.

## C.

Padilla commenced this action on February 9, 2007, while in civilian custody awaiting trial in his criminal case. The claims at issue in this appeal are alleged in his Third Amended Complaint, filed on July 23, 2008.

Padilla claims that, as a U.S. citizen captured within the United States, he was unconstitutionally designated as an enemy combatant, and alleges a range of constitutional violations stemming from his ensuing military detention: denial of his right to counsel under the First, Fifth, and Sixth Amend-

ments; denial of access to courts protected by Article III, the First and Fifth Amendments, and the Habeas Corpus Suspension Clause; unconstitutionally cruel conditions of confinement in violation of the Fifth and Eighth Amendments; coercive interrogations in violation of the Fifth and Eighth Amendments; denial of his freedom of religion under the First Amendment and the Religious Freedom Restoration Act; denial of access to information protected by the First Amendment; denial of freedom of association under the First Amendment; and general denial of due process protected by the Fifth Amendment. As relief, Padilla seeks a declaration that his designation, military detention, and treatment in custody were unconstitutional; a declaration that the policies that led to his treatment were unconstitutional; an injunction prohibiting his future designation and detention as an enemy combatant; and one dollar in damages from each defendant.

Padilla initially named sixty-one persons as defendants in this action. He has since dismissed his claims against those defendants who dealt most directly with his custody—specifically, the "legal professional[s]" who allegedly interfered with his access to counsel or the courts, *see* Third Amended Complaint ¶22; the "medical professional[s]" who monitored his confinement, *id.* at ¶23; and the interrogators and guards in direct control of his custody, *id.* at ¶¶24-25.

Seven defendants remain. Four are former high-ranking policymakers of the Defense Department sued in their personal capacities: former Secretary of Defense Donald H. Rumsfeld, former Deputy Secretary of Defense Paul Wolfowitz, former Defense Department General Counsel William Haynes, and former Director of the Defense Intelligence Agency Vice Admiral Lowell E. Jacoby. Padilla alleges that these defendants formulated an unconstitutional policy for detaining enemy combatants in the war on terrorism, which included the legal defense of that designation and the harsh interrogation measures used pursuant thereto. He does not charge any of these defendants personally with violating his

rights, for example by seizing him in violation of the Fourth Amendment or physically abusing him in violation of the Eighth Amendment. Rather, he holds them liable for developing the global detention and interrogation policies that he contends were unconstitutional both on their face and as applied to him.

Padilla also sues two former Commanders of the Naval Consolidated Brig, Catherine T. Hanft and Melanie A. Marr, alleging that they were responsible for "implement[ing] the unlawful regime devised and authorized by [the] Senior Defense Policy Defendants." *Id.* at ¶7.

Finally, Padilla sues current Secretary of Defense Leon Panetta in his official and individual capacities, seeking both declaratory relief and an injunction against his future designation as an enemy combatant.

On February 17, 2011, the district court granted the defendants' motion to dismiss Padilla's suit. *See Lebron v. Rumsfeld*, 764 F. Supp. 2d 787 (D.S.C. 2011). This appeal followed.

## II.

Padilla first faults the district court for refusing to imply a new cause of action for money damages against top Defense Department officials for a range of policy judgments pertaining to the designation and treatment of enemy combatants.[1]

---

[1]Padilla also seeks a retrospective declaration that both his detention and the broader detainee policies were unconstitutional. Inasmuch as equitable relief is prospective in nature, *see Hecht Co. v. Bowles*, 321 U.S. 321, 329-30 (1944), the request for a declaration of unlawful past confinement is in essence an attempt to prove a constitutional violation as the necessary predicate to any award of damages, *see Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971). As such, the requested declaration is part and parcel of the *Bivens* cause of action.

A.

We review the district court's ruling on a motion to dismiss de novo. *See Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 307 (4th Cir. 2007). Like the district court, we conclude that a proper regard for the constitutional structure requires us to decline to recognize this novel suit. The designations of persons and groups as special threats to national security may be subject to a variety of checks and to habeas corpus proceedings. But they are not reviewable by the judiciary by means of implied civil actions for money damages.

We begin by discussing the historic restraint applicable to implied causes of action and the judicial standards developed with respect to them. As to all but one of his claims,[2] Padilla asks the judiciary to imply a cause of action for constitutional violations by federal officials, as first recognized in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). However, the Supreme Court has long counselled restraint in implying new remedies at law. A *Bivens* action "has to represent a judgment about the best way to implement a constitutional guarantee; it is not an automatic entitlement." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007).

That judgment is focused not on "the merits of the particular remedy that was sought" but, rather, on "who should decide whether such a remedy should be provided," *Bush v. Lucas*, 462 U.S. 367, 380 (1983), specifically, Congress or the courts. "[B]edrock principles of separation of powers," *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001), dictate that the judiciary refrain from implying a remedy when "special factors counsel[ ] hesitation in the absence of affirmative action by Congress," *Bivens*, 403 U.S. at 397, or when Congress has provided "any alternative, existing process for protecting the interest [that] amounts to a convincing reason for the Judicial Branch to refrain from providing a new

---

[2] Padilla's RFRA claims are discussed *infra* Part III.

and freestanding remedy in damages," *Wilkie*, 551 U.S. at 550.

In the forty years since *Bivens*, the Supreme Court has monitored the limits of judicial competence to design implied remedies, frequently reminding the courts "that Congress is in a better position to decide whether or not the public interest would be served by creating" *Bivens* actions in new situations. *Bush*, 462 U.S. at 390. Exercising this restraint, the Court has itself "consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Malesko*, 534 U.S. at 68. It only recently declined to "imply the existence of an Eighth Amendment-based damages action . . . against employees of a privately operated federal prison." *Minneci v. Pollard*, No. 10-1104, slip op. at 1, 565 U.S. ___ (2012).

Given these principles, we must approach Padilla's invitation to imply a *Bivens* action here with skepticism. "The *Bivens* cause of action is not amenable to casual extension," *Holly v. Scott*, 434 F.3d 287, 289 (4th Cir. 2006), but rather is subject to a strict test adopted by this court. To maintain a *Bivens* claim, Padilla must demonstrate both that "there are no 'special factors counseling hesitation in the absence of affirmative action by Congress'" and that "Congress has not already provided an exclusive statutory remedy." *Hall v. Clinton*, 235 F.3d 202, 204 (4th Cir. 2000) (citation omitted). We do not require congressional action before recognizing a *Bivens* claim, as that would be contrary to *Bivens* itself. We will, however, refuse to imply a *Bivens* remedy where, as in this case, Congress's pronouncements in the relevant context signal that it would not support such a damages claim.

B.

Special factors do counsel judicial hesitation in implying causes of action for enemy combatants held in military detention. First, the Constitution delegates authority over military affairs to Congress and to the President as Commander in

Chief. It contemplates no comparable role for the judiciary. Second, judicial review of military decisions would stray from the traditional subjects of judicial competence. Litigation of the sort proposed thus risks impingement on explicit constitutional assignments of responsibility to the coordinate branches of our government. Together, the grant of affirmative powers to Congress and the Executive in the first two Articles of our founding document suggest some measure of caution on the part of the Third Branch.

1.

Preserving the constitutionally prescribed balance of powers is thus the first special factor counseling hesitation in the recognition of Padilla's *Bivens* claim. The "Constitution contemplated that the Legislative Branch [have] plenary control over rights, duties, and responsibilities in the framework of the military establishment, including regulations, procedures, and remedies." *Chappell v. Wallace*, 462 U.S. 296, 301 (1983). Indeed, that control is explicit and not merely derivative of other powers: Congress has the enumerated powers to declare war, *see* U.S. Const., art. I, § 8, cl. 11; establish the armed forces, *see id.* cl. 12-13; and "make Rules for the Government and Regulation of the land and naval Forces," *id.* cl. 14. As the Supreme Court has noted, "What is distinctive here is the specificity of that technically superfluous grant of power . . . Had the power to make rules for the military not been spelled out, it would in any event have been provided by the Necessary and Proper Clause—as is, for example, the power to make rules for the government and regulation of the Postal Service." *United States v. Stanley*, 483 U.S. 669, 682 (1987) (internal citation omitted). As a consequence, "in no other area has the Court accorded Congress greater deference." *Rostker v. Goldberg*, 453 U.S. 57, 64-65 (1981).

Further supporting judicial deference is the Constitution's parallel commitment of command responsibility in national security and military affairs to the President as Commander in

Chief. *See* U.S. Const. art. II, § 2, cl. 1. Here too, judges "traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988). As a result, the Supreme Court has consistently shown "great deference" to what "the President—the Commander in Chief—has determined . . . is essential to national security." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24, 26 (2008).

When, as here, these two branches exercise their military responsibilities in concert –- Congress by enacting the AUMF and the President by detaining Padilla pursuant thereto, *see Padilla V*, 423 F.3d 386—the need to hesitate before using *Bivens* actions to stake out a role for the judicial branch seems clear. It is settled that courts "accord the President the deference that is his when he acts pursuant to a broad delegation of authority from Congress." *Id.* at 395. In *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), Justice Jackson described the heightened judicial caution signalled by facts such as those presented here: "A seizure executed by the President pursuant to an Act of Congress would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Id.* at 637 (Jackson, J., concurring).

The reasons for this constitutional structure are apparent. Questions of national security, particularly in times of conflict, do not admit of easy answers, especially not as products of the necessarily limited analysis undertaken in a single case. It is therefore unsurprising that "our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them." *Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004).

This explicit constitutional delegation of control over military affairs is quite relevant to the *Bivens* inquiry. *See Stanley*,

483 U.S. at 683 ("[T]he 'special facto[r]' that 'counsel[s] hesitation' is . . . the fact that congressionally uninvited intrusion into military affairs by the judiciary is inappropriate."). Observance of the constitutional structure requires that courts properly consider whether officials of other branches, named in *Bivens* suits, "enjoy such independent status in our constitutional scheme as to suggest that judicially created remedies against them might be inappropriate." *Carlson v. Green*, 446 U.S. 14, 19 (1980). Thus, whenever the Supreme Court has considered a *Bivens* case involving the military, it has concluded that "the insistence . . . with which the Constitution confers authority over the Army, Navy, and militia upon the political branches . . . counsels hesitation in our creation of damages remedies in this field." *Stanley*, 483 U.S. at 682. Put simply, "such a remedy would be plainly inconsistent with Congress' authority" in military affairs. *Chappell*, 462 U.S. at 304.[3]

These general observations are amply reinforced by the particulars of Padilla's case. To stay the judiciary's hand in fashioning the requested *Bivens* action, it suffices to observe that Padilla's enemy combatant classification and military detention raise fundamental questions incident to the conduct of armed conflict, and that "Congress, the constitutionally authorized source of authority over the military system of justice, has not provided a damages remedy." *Id.* at 304. To the extent the Constitution may require these defendants to justify in court who is and is not an enemy combatant, it does so in

---

[3]We respect the service to our country of the retired military officers who have offered their views as amici curiae in this case. Their conclusion, however, that this *Bivens* action "will cause no interference with the legitimate mission of our military forces," Retired Military Officers' Amicus Br. at 24, misapprehends the question posed by "special factors" analysis. We do not address the merits of whether a damages remedy would interfere with the military or not. Rather, we defer to Congress as the branch constitutionally charged with addressing that question, and we will not readily displace the legislative role by concluding on our own authority that damages are appropriate.

the very different context of habeas corpus proceedings, *see Hamdi*, 542 U.S. at 533, proceedings that Padilla took full advantage of up until his transfer to civilian custody. *See supra* Part I.B.

The relevance of these separation of powers concerns is underscored by the nature of Padilla's allegations. The bulk of Padilla's complaint describes the evolution of the "detention and interrogation policies developed by Senior Defense Policy defendants," Third Amended Complaint ¶49, which Padilla contends "proximately and foreseeably" caused the harm he suffered from his detention and conditions of confinement, *id.* at ¶6. In the course of describing the internal debate over detainee policy, however, the complaint makes very clear the extent to which the progression of this lawsuit would draw courts into the heart of executive and military planning and deliberation.

Padilla primarily challenges "the [detainee] policy developed by Senior Defense Policy Defendants." *Id.* at ¶37. Padilla describes how this policy was created as part of the broader effort in the fall of 2001 "to develop policy in the war on terrorism." *Id.* at ¶47. Almost immediately after 9/11, the defendants in this suit sought the advice of the Justice Department, obtaining ten different memoranda from the Office of Legal Counsel discussing the scope of presidential authority under the AUMF, application of the Geneva Conventions to members of al Qaeda, and permissible forms of interrogation. *Id.* at ¶50. Nor was this the only legal advice the defendants received. The FBI weighed in, *id.* at ¶67, as did Alberto Mora, General Counsel of the Navy, *id.* at ¶72.

The debate over what interrogation techniques to use in combating al Qaeda received equally high level attention. According to the complaint, Major General Michael Dunlavey, the commander of Joint Task Force 170 at Guantanamo Bay, Cuba, received input on the appropriateness of specific interrogation techniques from, among others, the Defense

Human Intelligence Services, *id.* at ¶60; Col. Steve Kleinman, the head of the U.S. Air Force's strategic interrogation program; and Dr. Michael Gelles, the Navy's top forensic psychologist, *id.* at ¶71. Kleinman and Gelles presented dissenting positions, objecting to the use of certain techniques. *Id.* The defendants took an approach that reflects this diversity of views—while Haynes told Rumsfeld that some enhanced interrogation techniques "may be legally available," they "should not be the subject of a blanket approval at this time." *Id.* at ¶67.

Later, interrogation policy was directed by the "Working Group on Detainee Interrogations in the Global War on Terrorism," which included defendant Haynes, general counsel of the Department of Defense; Michael Mobbs, the head of the Detainee Policy Group; representatives of the Defense Intelligence Agency; and the General Counsels and Judge Advocate Generals of the various departments of the military –- all reporting to the Secretary and Deputy Secretary of Defense. *Id.* at ¶73.

Nor did high-level oversight end with the creation of the detainee policy. The complaint asserts that in May 2004, defendant Rumsfeld ordered the Naval Inspector General, Vice Admiral Albert T. Church, to conduct a review of detentions at the Naval Consolidated Brig where Padilla was held. *Id.* at ¶104. Admiral Church's review included over 100 interviews and a variety of affidavits, JA-627, and frankly acknowledged that "friction occurred between the FBI and DOD" over what interrogation methods were best to use. Third Amended Complaint ¶121.

Finally, even the few allegations specific to Padilla reveal the sensitive nature of the debate into which his suit would draw the courts. Padilla describes his own detention as deriving from intelligence obtained from "two suspected terrorists detained and interrogated outside the United States." *Id.* at ¶40. Similarly, the specific conditions at the Naval Consoli-

dated Brig were the result of a policy choice that all detainees should receive the same treatment, regardless of where they were held. *See, e.g.*, *id.* at ¶107 ("JTF-GTMO [does] not provide [the Geneva Conventions] to their detainees. Accordingly, neither will the NAVCONBRIG.").

In short, Padilla's complaint seeks quite candidly to have the judiciary review and disapprove sensitive military decisions made after extensive deliberations within the executive branch as to what the law permitted, what national security required, and how best to reconcile competing values. It takes little enough imagination to understand that a judicially devised damages action would expose past executive deliberations affecting sensitive matters of national security to the prospect of searching judicial scrutiny. It would affect future discussions as well, shadowed as they might be by the thought that those involved would face prolonged civil litigation and potential personal liability.

Of course Congress may decide that providing a damages remedy to enemy combatants would serve to promote a desirable accountability on the part of officials involved in decisions of the kind described above. But to date Congress has made no such decision. This was not through inadvertence. Congress was no idle bystander to this debate. Indeed, it devoted extensive attention to the precise questions Padilla presents pertaining to the treatment of detainees and to the legitimacy of interrogation measures, *see, e.g.*, Military Commissions Act of 2009, Pub. L. 111-84, 123 Stat. 2190; Military Commissions Act of 2006, Pub. L. 109-366, 120 Stat. 2600; Detainee Treatment Act of 2005, Pub. L. 109-148, 119 Stat. 2739. For example, Congress provided in the Detainee Treatment Act of 2005 that "No person in the custody . . . of the Department of Defense . . . shall be subject to any treatment or technique of interrogation not authorized by and listed in the United States Army Field Manual on Intelligence Interrogation." Pub. L. 109-163 § 1402, 119 Stat. 3475. It further provided that "[n]o individual in the custody . . . of the

United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment . . . as defined in the United States Reservations, Declarations, and Understandings to the United Nations Convention Against Torture." 120 Stat. 2635. And the Military Commissions Act of 2009, Pub. L. 111-84, 123 Stat. 2190, prohibits the use of a "statement obtained by the use of torture or by cruel, inhuman, or degrading treatment . . . whether or not under color of law" in the trial of an enemy combatant before a military commission. 123 Stat. 2580.

This history reveals a Congress actively engaged with what interrogation techniques were appropriate and what process was due enemy combatant detainees. In enacting these statutes, Congress acted with a "greater ability to evaluate the broader ramifications of a remedial scheme by holding hearings and soliciting the views of all interested parties," *Holly*, 434 F.3d at 290, than we possess, constrained as we are by the limited factual record of a single case. Padilla asks us to ignore this ample evidence that "congressional inaction has not been inadvertent," *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988), and to do what Congress did not do, namely to trespass into areas constitutionally assigned to the coordinate branches of our government.

This is a case in which the political branches, exercising powers explicitly assigned them by our Constitution, formulated policies with profound implications for national security. One may agree or not agree with those policies. One may debate whether they were or were not the most effective counterterrorism strategy. But the forum for such debates is not the civil cause of action pressed in the case at bar. The fact that Padilla disagrees with policies allegedly formulated or actions allegedly taken does not entitle him to demand the blunt deterrent of money damages under *Bivens* to promote a different outcome. Being judicial requires that we be judicious, and adherence to our constitutional role in this area requires that we await "affirmative action by Congress." Put simply, creat-

ing a cause of action here is "more appropriately for those who write the laws, rather than for those who interpret them." *United States v. Gilman*, 347 U.S. 507, 513 (1954).

2.

In addition to these structural constitutional concerns, a second factor causing hesitation in the *Bivens* context is the departure from core areas of judicial competence that such a civil action might entail. This second factor overlaps to some extent with the dangers of intrusion into the constitutional responsibilities of others described above. But it also raises a discrete set of problems all its own pertaining to the ability of the judiciary to administer a *Bivens* remedy in a case like the one at hand.

The problems of administrability here are at least two-fold. The first has to do with the interruption of the established chains of military command. The Supreme Court has cautioned against entertaining suits that could be so "problematic, raising the prospect of compelled depositions and trial testimony by military officers concerning the details of their military commands." *Stanley*, 483 U.S. at 682-83. Padilla's suit proposes to do precisely what the Supreme Court has instructed we not do: "require members of the Armed Services" and their civilian superiors "to testify in court as to each other's decisions and actions," *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 673 (1977) in order "to convince a civilian court of the wisdom of a wide range of military and disciplinary decisions." *United States v. Shearer*, 473 U.S. 52, 58 (1985).

Padilla's complaint is replete with references to the hierarchy of the Defense Department and its responsibility for overseeing the nation's armed services. For example, he emphasizes that Secretary of Defense Donald Rumsfeld "exercised command and control over all members of the U.S. military," Third Amended Complaint ¶14, and that the mili-

tary supervisor defendants at the brig were responsible "for receiving[ ] and implementing orders from higher-ranking members of the chain of command." *Id.* at ¶¶22-27. Padilla's very theory of liability thus depends upon a probe of the command structure of our military establishment, a hierarchy that the federal courts have heretofore been reluctant to disrupt. The gravamen of Padilla's complaint is that commanders and subordinates should be made to consider the possibility of liability for *Bivens* damages before formulating and implementing directives pertaining to military detentions. If such a check is warranted, the Constitution requires that Congress impose it rather than courts imply it. After all, not only does Congress have authority to regulate the nation's military, it is also "in a far better position than a court to evaluate the impact of a new species of litigation against those who act on the public's behalf. And Congress can tailor any remedy to the problem perceived, thus lessening the risk of raising a tide of suits threatening legitimate initiative on the part of the Government's employees." *Wilkie*, 551 U.S. at 562 (internal quotation marks and citations omitted).

A second difficulty of administering Padilla's proposed *Bivens* action pertains to its practical impact on military intelligence operations. Padilla's proposed litigation risks interference with military and intelligence operations on a wide scale. Any defense to Padilla's claims—which effectively challenge the whole of the government's detainee policy—could require current and former officials, both military and civilian, to testify as to the rationale for that policy, the global nature of the terrorist threat it was designed to combat, the specific intelligence that led to the application of that policy to Padilla, where and from whom that intelligence was obtained, what specific military orders were given in the chain of command, and how those orders were carried out. As the Second Circuit has noted in an analogous context, "A suit seeking a damages remedy against senior officials who implement an extraordinary rendition policy would enmesh the courts ineluctably in an assessment of the validity and rationale of that policy and

its implementation in this particular case, matters that directly affect significant diplomatic and national security concerns." *Arar v. Ashcroft*, 585 F.3d 559, 575 (2d Cir. 2009) (en banc).

The Supreme Court has taken such administrability concerns seriously. Cautioning against the implication of a *Bivens* cause of action here are practical concerns about obtaining information necessary for the judiciary to assess the challenged policies. Much of the information relevant to the creation of the detainee policy remains classified. While we have no doubt that courts would seek to protect such sensitive information, *see* Classified Information Procedures Act, 18 U.S.C. App. III §§1-16, even inadvertent disclosure may jeopardize future acquisition and maintenance of the sources and methods of collecting intelligence. As the Supreme Court has recognized, "Even a small chance that some court will order disclosure of a source's identity could well impair intelligence gathering and cause sources to 'close up like a clam.'" *CIA v. Sims*, 471 U.S. 159, 175 (1985). The chilling effects on intelligence sources of possible disclosures during civil litigation and the impact of such disclosures on military and diplomatic initiatives at the heart of counterterrorism policy often elude judicial assessment. If courts assay such assessments, it should be because the legislative branch has authorized that course.

The problems of administrability are thus compounded by their relative novelty. The inquiries presaged by Padilla's action are far removed from questions of probable cause, *see Bivens*, 403 U.S. 388, or deliberate indifference to medical treatment, *see Carlson*, 446 U.S. 14, routinely confronted by district courts in suits under 42 U.S.C. § 1983 or *Bivens*. In fact, when the Supreme Court has approved *Bivens* actions, it has expressly noted that the questions presented fell within the traditional competence of courts. *See Davis v. Passman*, 442 U.S. 228, 245 (1979) (approving *Bivens* claim for gender discrimination in part because "[l]itigation under Title VII of the Civil Rights Act of 1964 has given federal courts great

experience evaluating claims for backpay due to illegal sex discrimination.")

Padilla downplays these administrability concerns. He argues that a *Bivens* action will not require courts to do much more than they are doing already. Appellant's Br. at 27-28. It is inescapable, to be sure, that the branches of government will sometimes interact, and the courts will be called upon to take up sensitive matters. In those instances, however, Congress has often provided courts with specific means and mechanisms to consider delicate questions without imperiling national security. Congress has not just opened up something akin to a *Bivens* action to courts of general federal question jurisdiction and left them without guidelines how to proceed. Padilla also argues that cases like *Stanley* and *Chappell*, which recognized the likelihood that certain *Bivens* actions would interfere with military defense, do not apply to him because he is not a member of the armed forces. But this misconceives the nature of the special factors analysis. The source of hesitation is the nature of the suit and the consequences flowing from it, not just the identity of the plaintiff.

Numerous examples suffice to illustrate the point that Congress has been cautious about conferring broad discretionary powers on all Article III courts in matters trenching on important national security concerns. For example, even though courts routinely consider applications for telephone intercepts in criminal cases under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90-351, 82 Stat. 197, Congress created the special Foreign Intelligence Surveillance Court to consider wiretap requests in the highly sensitive area of investigations of "a foreign power or an agent of a foreign power." 50 U.S.C. §§ 1803-04. With respect to detainees like Padilla, Congress has provided for limited judicial review of military commission decisions, but only by the District of Columbia Circuit Court of Appeals, and only after the full process in military courts has run its course. 10 U.S.C. § 950g. And to the extent that the Supreme Court in *Boumed-*

*iene v. Bush*, 553 U.S. 723 (2008), permitted further judicial examination of the detention of enemy combatants, it did so using the limited tool of the constitutionally guaranteed writ of habeas corpus—not an implied and open-ended civil damages action. *See id.* at 797. And the Court recognized the need for the judiciary carefully to avoid adverse effects on our national security, limiting proper venue for detainee habeas cases to the District of Columbia District Court so as to "reduce administrative burdens on the Government" and "to avoid the widespread dissemination of classified information." *Id.* at 796.

Even a cursory survey thus suffices to illustrate that when Congress deems it necessary for the courts to become involved in sensitive matters, such as those involving enemy terrorists, it enacts careful statutory guidelines to ensure that litigation does not come at the expense of national security concerns. Such circumscribed grants and detailed directions as those set forth above stand in stark contrast to the unencumbered discretion that Padilla would invite all Article III courts across this country to exercise. Padilla responds that such constructs as qualified immunity and the state secrets privilege should suffice to allay these concerns. *See* Appellant's Br. at 24-25. But the litigation of such matters still presents the potential of diverting "efforts and attention" from the primary obligations of officials entrusted with the sober responsibilities of protecting the lives and safety of American citizens. *Johnson v. Eisentrager*, 339 U.S. 763, 779 (1950). Moreover, courts have developed these doctrines to prevent unintended adverse effects on national security from already-established causes of action. *See Tenet v. Doe*, 544 U.S. 1, 9-11 (2005). Here, by contrast, Padilla asks for a new *Bivens* cause of action, and the Supreme Court has instructed us to consider any aspect of that claim that would cause us to hesitate before entertaining suit. *See Bivens*, 403 U.S. at 397. We need not await the formal invocation of doctrines such as qualified immunity or state secrets to say that the prospect of adverse collateral consequences confirms our view that Con-

gress rather than the courts should decide whether a constitutional claim should be recognized in these circumstances. *See Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008) ("[T]he concerns that underlie the protective restrictions of the [Intelligence Identities Protection Act] and the *Totten* [state secrets] doctrine are valid considerations in the *Bivens* analysis and weigh against creating a remedy in this case.").

The factors counseling hesitation are many. We have canvassed them in some detail, but only to make a limited point: not that such litigation is categorically forbidden by the Constitution, but that courts should not proceed down this highly problematic road in the absence of affirmative action by Congress. If Congress were to create a damages remedy here, we would trust that the legislative process gave due consideration to the broader policy implications that we as judges are neither authorized nor well-positioned to balance on our own.

## C.

Before recognizing a *Bivens* action, courts must not only consider special factors that would counsel hesitation, but also "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie*, 551 U.S. at 550. Here, Padilla had extensive opportunities to challenge the legal basis for his detention.

Padilla challenged his military detention in habeas corpus proceedings before five different courts. In adjudications on the merits before district courts in the Southern District of New York and the District of South Carolina, and on appeals to the Second Circuit and to this court, Padilla was able to present essentially the same arguments that he makes here about the legality of militarily detaining a U.S. citizen. *See generally Padilla II*, 352 F.3d 695; *Padilla V*, 423 F.3d 386 (characterizing Padilla's arguments). Padilla pursued those

claims up until the very moment that they were mooted by his transfer into civilian custody. And if Padilla is again detained by the military, he could presumably avail himself further of whatever "adequate and effective substitute for habeas corpus" is in use for detainees at that time. *Boumediene*, 553 U.S. at 795. With respect to Padilla's claims arising from his enemy combatant designation, this is not a case of "damages or nothing." *Davis*, 442 U.S. at 245. The Supreme Court has warned that "the full protections that accompany challenges to detentions in other settings may prove unworkable and inappropriate in the enemy-combatant setting." *Hamdi*, 542 U.S. at 535.

"That [Padilla] considers [his] existing remedies insufficient is simply irrelevant" to whether a court should imply a *Bivens* action. *Judicial Watch v. Rossotti*, 317 F.3d 401, 413 (4th Cir. 2003). *Bivens* "is concerned solely with deterring individual officers' unconstitutional acts." *Malesko*, 534 U.S. at 71. In such circumstances, we cannot regard the legislative failure to provide Padilla with the monetary damages he seeks from each defendant as an invitation to design some preferred remedial regime of our own.

## D.

All these sources of hesitation in recognizing Padilla's *Bivens* claim are related. The practical concerns merely serve to illustrate the wisdom of the constitutional design, which commits responsibility for military governance and the conduct of foreign affairs to the branches most capable of addressing them and most accountable to the people for their choices. Padilla asks us to intervene in a manner courts have not before seen fit to attempt. To say that the cumulative concerns "counsel hesitation" is something of an understatement, and we must decline to create the damages remedy Padilla seeks. Because we conclude that Padilla's *Bivens* action cannot be maintained, we need not reach the questions of whether

the defendants are entitled to qualified immunity or whether Padilla has pleaded his claim with adequate specificity.

### III.

Padilla also brought suit under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq*. That statute authorizes "[a] person whose religious exercise has been burdened" to "obtain appropriate relief against a government." *Id.* § 2000bb-1(c). Padilla contends that this provision permits him to recover damages by suing the individual defendants in their personal capacities.

Congress enacted RFRA in response to the Supreme Court's decision in *Emp't Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872 (1990), seeking "to restore the compelling interest test . . . and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1). RFRA initially applied to both the states and the federal government, but the Supreme Court concluded in *City of Boerne v. Flores*, 521 U.S. 507 (1997), that the statute exceeded Congress's remedial powers over the states under section 5 of the Fourteenth Amendment. *See id.* at 532-36. Congress "sought to avoid *Boerne*'s constitutional barrier by relying on its Spending and Commerce Clause powers" in enacting the subsequent Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq*. *Madison v. Riter*, 355 F.3d 310, 315 (4th Cir. 2003). Congress has thus created a parallel statutory scheme, using virtually identical language, in which "RFRA continue[s] to apply to the federal government" and RLUIPA "mirror[s] the provisions of RFRA" in suits against the states concerning land regulation or institutionalized persons. *Id.* Because of the close connection in purpose and language between the two statutes, courts commonly apply "case law decided under RFRA to issues that arise under RLUIPA" and vice versa. *Redd v. Wright*, 597 F.3d 532, 535 n.2 (2d Cir. 2010).

For the reasons that follow, we believe that to permit recovery in this case would be at odds with the positions of the two coordinate branches to whom our Constitution has entrusted primary responsibility for the conduct of military affairs. As we shall explain, it is anything but clear that Congress has created under RFRA a cause of action that Padilla may bring against these federal officers.

As a preliminary matter, we have no occasion to inquire how RFRA applies outside a military setting. Those questions are not before us, and we have no need to address them. The military context is, however, once again important. There exist strong reasons for defendants to believe that RFRA did not apply to enemy combatants detained by the military. Indeed, no authority suggested to the contrary. And the defendants have asserted that, at the very least, they are entitled to the qualified immunity available to public officials on the grounds that "any rights that enemy combatants may have had under RFRA were not clearly established during the period of Padilla's military detention." Appellee's Br. of Hanft et al. at 46. We agree. This case is an appropriate one for the recognition of the immunity defense because it would run counter to basic notions of notice and fair warning to hold that personal liability in such an unsettled area of law might attach. The following discussion underscores why it would be impermissible for us to conclude that the relevant law was clearly established in anything like a manner that would vitiate a qualified immunity defense. We thus dismiss Padilla's RFRA claim on qualified immunity grounds.

Padilla contends that Congress clearly intended RFRA to authorize "enemy combatants" to challenge the circumstances of their military detention. We are not persuaded. Claims implicating national security and war powers flash caution signals all their own. Courts have long been reluctant to interpret statutes in ways that allow litigants to interfere with the mission of our nation's military, preferring that Congress

explicitly authorize suits that implicate the command decisions of those charged with our national defense.

Perhaps the best known example of this principle is the doctrine derived from *Feres v. United States*, 340 U.S. 135 (1950). There, the Supreme Court concluded that even though the Federal Tort Claims Act, 28 U.S.C. § 1346(b), had no express limits on who may recover from the government and even included as possible tortfeasors "members of the military or naval forces," 28 U.S.C. § 2671(1), the statute did not authorize tort suits by members of the military for injuries sustained while engaged in military service. The *Feres* Court emphasized two principles: first, the unique nature of "authorities over persons [that] the government vests in echelons of command," and second, a "reluctance to impute to Congress such a radical departure . . . in the absence of express congressional command." *Feres*, 340 U.S. at 141, 145. The Court sixty-one years ago expressed the same puzzlement that gives us pause in sanctioning Padilla's RFRA action today: "If Congress had contemplated that this Tort Act would be held to apply in cases of this kind, it is difficult to see why it should have omitted any provision to [authorize it]. The absence of any such [provision] is persuasive that there was no awareness that the Act might be interpreted to permit recovery for injuries incident to military service." *Id.* at 144.

This need for hesitation is present in the context of military detention. In *United States v. Joshua*, 607 F.3d 379 (2010), our court recently emphasized the substantial differences between individuals in civilian custody and individuals in military custody. Those in military custody—either through designation as enemy combatants or courts martial—are subject to the UCMJ, a different body of law than applies to those in civilian life. And whereas "a civilian criminal code carves out a relatively small segment of potential conduct and declares it criminal, the Uniform Code of Military Justice essays more varied regulation of a much larger segment of . . . activities." *Id.* at 383 (quoting *Parker v. Levy*, 417 U.S. 733, 749 (1974)).

Military proceedings are held before military judges who do not enjoy the protections of Article III. *Id.* Nor do the full measure of traditional civilian "constitutional guarantees" of rights for defendants apply. *Id.* at 383-384.

In *Joshua*, our concern about the "different substantive laws and separate adjudicative proceedings," *id.* at 382, was sufficiently great that we held that the military still retained "custody" over an individual even if his physical place of confinement was in a civilian jail. In interpreting the federal civil commitment statute, 18 U.S.C. § 4248, we found it significant that Congress had created a separate "elaborate mechanism" with "detailed procedures for hospitalizing and civilly committing military defendants" codified in the UCMJ itself. *Id.* at 389 n.7. We held that this "belie[d] the suggestion that Congress intended to bring military prisoners into § 4248." *Id.* In short, when Congress wishes to legislate with respect to the military, it does so both unmistakably and typically in those sections of the U.S. Code that apply to military affairs.

Congress is aware of the reluctance by courts to intrude into matters of military governance, and when it wishes to legislate with respect to the military, it does so with precision. For example, in a case predating RFRA, the Supreme Court denied a free exercise challenge by a Jewish doctor to an Air Force regulation that effectively prohibited him from wearing a yarmulke. *See Goldman v. Weinberger*, 475 U.S. 503 (1986). When Congress wished to overturn that decision, it did so with a carefully drawn statute, 10 U.S.C. § 774. Codified in Title 10, which also contains the UCMJ and other military regulations, the statute authorizes wearing religious apparel, but preserves specific authority for the Secretary of Defense to prohibit wearing religious clothing that "would interfere with the performance of the member's military duties" or "is not neat and conservative." *See id.* § 774(b). The statute does not sweep broadly, addressing only the limited situation in which a serviceman's uniform interferes with his ability to wear a religious garment, and it does not create a

cause of action allowing military regulations to be challenged in civilian courts. The legislative care that was necessary in that context would be equally expected here. Just as Congress did not leave it to the Article III courts to decide when soldiers can vary their attire from the military uniform, so too have we not been given the discretion to decide what practices can safely be permitted to military detainees.

RFRA and the congressional response to *Goldman* present in fact a useful study in contrasts. As noted, RFRA was an effort to reverse the Supreme Court's denial of a free exercise claim in *Emp't Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872 (1990) (holding that the Free Exercise Clause does not require accommodation of a religious practice as long as the challenged government policy is generally and neutrally applicable). Congress passed RFRA to overturn the decision in the civilian context, locating the statute in Title 42 along with other civilian civil rights, and failing to include the exceptions or discretionary authority that only four years before Congress deemed so necessary to achieving the same result in the military context. For unlike Congress's narrowly tailored response to *Goldman* in Title 10, RFRA addresses any free exercise claim, not only the limited facts presented by *Smith*. The contrast is striking, and it is hard to contend that a Congress that took such pains to ensure that the wearing of religious garments did not unnecessarily interfere with the military mission somehow meant for RFRA to provide a cause of action for a detained terrorist suspect to challenge the conditions of his confinement.

Padilla offers us no evidence to support the conclusion that RFRA supplies an action at law to enemy combatants in military detention. Given the stark differences between civilian and military detentions described in *Joshua*, we would be culpable of a complete transposition of contexts to apply RFRA in the circumstances here. Indeed, the same concerns about judicial interference with the military that caused us to hesitate in implying a *Bivens* action give us pause in interpreting

this statute to achieve an equally unanticipated and comparably disruptive outcome. *See Rasul v. Myers*, 563 F.3d 527, 535-36 (D.C. Cir. 2009), *cert. denied*, 130 S. Ct. 1013 (2009) (Brown, J., concurring) ("Accepting plaintiffs' argument that RFRA imports the entire Free Exercise Clause edifice into the military detention context would revolutionize the treatment of captured combatants in a way Congress did not contemplate. In drafting RFRA, Congress was not focused on how to accommodate the important values of religious toleration in the military detention setting."). Were Congress to prefer damages actions over alternate remedies for those in Padilla's situation, that would be one thing. But we have no indication that Congress even considered the prospect of RFRA actions brought by enemy combatants with anything like the care that it has customarily devoted to matters of such surpassing sensitivity.

The foregoing discussion underscores what we believe are considerable obstacles to applying RFRA in this context. But we need not go so far as to announce such a proposition in its most absolute terms. Under *Pearson v. Callahan*, 129 S. Ct. 808 (2009), we are permitted to explain directly why "there was no violation of clearly established law." *Id.* at 820. As set forth in *Pearson*, the qualified immunity inquiry is hardly an empty one. For here it brings us to the threshold question of whether RFRA even speaks to the military detention setting. We think it anything but clearly established that it does. At the very least, the defendants transgressed no clearly established law in this area, and to hold them personally liable in the absence of clear notice that such a prospect was even possible would run counter to the reasons that the immunity exists. *See Rasul*, 563 F.3d at 533 n.6. For the reasons heretofore expressed, we hold that the defendants have asserted a valid qualified immunity defense to Padilla's RFRA claim.

## IV.

Padilla's final claim is that the district court erred in concluding that he lacked standing to seek an order enjoining the

government from designating him as an enemy combatant in the future.

The standing doctrine gives practical effect to the Constitution's "fundamental limits on federal judicial power in our system of government" imposed by the case or controversy requirement. *Allen v. Wright*, 468 U.S. 737, 750 (1984). To satisfy this jurisdictional baseline, a plaintiff must demonstrate:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

Padilla claims he has sustained two types of "injury in fact": a reasonable fear of future military detention and an ongoing stigma resulting from his prior detention as an enemy combatant. We shall address each in turn.

### A.

A plaintiff who seeks, as Padilla does, to enjoin a future action must demonstrate that he "'is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Padilla argues that he has alleged such danger by virtue of his prior enemy combatant designation and the government's failure to deny the possibility that it could designate him an enemy combatant in the future. Padilla's only support for this apprehension is that then-Deputy Solicitor General Gregory Garre informed his attorney in November 2005 that the policy could

be reapplied to him. His own brief acknowledges, however, that the most that can be read into this statement is that "the military *could* therefore detain Padilla at any time." Appellant's Br. at 48 (emphasis added). This proves no more than that there is a possibility that Padilla could be redesignated an enemy combatant.

The Supreme Court has repeatedly rejected such a basis for standing. Time and again, the Court has reiterated that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Lyons*, 461 U.S. at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). And it is equally insufficient for a plaintiff claiming standing to observe that the challenged conduct is repeatable in the future. *See Golden v. Zwickler*, 394 U.S. 103, 109 (1969) (noting "that the former Congressman *can* be a candidate for Congress again is hardly a substitute for evidence that this *is* a prospect of immediacy and reality" (emphasis added)). Nor does a claim that the purportedly illegal practice is commonly used suffice to make the threat to the plaintiff sufficiently concrete. *Lyons*, 461 U.S. at 106 ("The additional allegation in the complaint that the police in Los Angeles routinely apply chokeholds . . . falls far short of the allegations that would be necessary to establish a case or controversy between these parties.").

Not only has Padilla failed to allege a "real" threat, but he also cannot allege an "immediate" one. Convicted of serious charges of terrorism, and now facing more than seventeen years in jail on resentencing, *see Jayyousi*, 657 F.3d 1115-19, the possibility that the President will exercise "[his] authority to subject those [he] designates as enemy combatants to military detention even after they complete a civilian jail sentence," Appellant's Br. at 52, will not arise for many years. Much could occur in the interval to head off such an event. Much could occur to change the requirements and procedures of enemy combatant detentions. To resolve the legality of such a remote military detention at present quite simply "takes

us into the area of speculation and conjecture," *O'Shea*, 414 U.S. at 497, far removed from "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962).

Indeed, when the Supreme Court denied certiorari on Padilla's habeas petition, mooted by his intervening criminal prosecution, three Justices voiced these precise concerns. "Any consideration of what rights he might be able to assert if he were returned to military custody would be hypothetical." *Padilla VIII*, 547 U.S. at 1062 (Kennedy, J., concurring, joined by Roberts, C.J., and Stevens, J.). Any "continuing concern that [Padilla's] status might be altered again . . . can be addressed if the necessity arises. . . . Were the Government to seek to change the status or conditions of Padilla's custody, [the Florida District Court] would be in a position to rule quickly." *Id.*

Padilla submits that the district court erred in considering the effect of his criminal conviction and sentence on the imminence of any future injury he might suffer as a result of being designated an enemy combatant. He argues that because those events occurred after his suit was filed, they are relevant only to mootness, not standing. But both requirements— standing and mootness—address themselves to the actuality, and hence the justiciability, of a dispute. "Mootness has been described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n. 22 (1997) (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)). Thus, whatever label we choose to put on the analysis, the conclusion is the same: the prospect of any justiciable controversy is so remote and contingent that we have no authority to consider Padilla's request. In sum, the district court did not err in considering the fact of Padilla's conviction and sentence, and we

also may consider the Eleventh Circuit's affirmance of his
conviction and its remand to the district court for imposition
of an even lengthier prison term.

## B.

Padilla also claims that he suffers a continuing injury from
the stigma of being labeled an enemy combatant.
"[C]ontinuing, present adverse effects" stemming from "[p]ast
exposure to illegal conduct" can suffice to establish standing.
*O'Shea*, 414 U.S. at 495. That, however, is not this case. The
reputational harm Padilla alleges is still inadequate to satisfy
the "injury in fact" requirement.

As the district court correctly concluded, Padilla's criminal
convictions for serious terrorism related charges make it
unlikely that he suffers any additional harm as a result of his
designation as an enemy combatant. This case presents analo-
gous circumstances to those confronted by the D.C. Circuit in
*McBryde v. Committee to Review Circuit Council Conduct*,
264 F.3d 52 (2001). There, that court found that a former fed-
eral judge lacked standing to challenge suspensions that had
already been completed based on the stigmatizing effect of
the records of that punishment. It noted that "[t]he legally rel-
evant injury is only the incremental effect of a record of the
suspensions . . . over and above that caused by the . . . explicit
condemnations." *Id.* at 57.

Here, Padilla was convicted after trial of three federal
crimes of terrorism based on proof that he was a member of
al Qaeda who had conspired with leaders of that organization
and who was receiving training in an al Qaeda camp in
Afghanistan at the very moment that members of that organi-
zation were murdering thousands of people with hijacked air-
craft on 9/11.[4] It is hard to imagine what "incremental" harm

---

[4]Moreover, Padilla's claim of stigmatic injury is purely derivative of his
other claims, giving us added reason to agree with the district court that

it does to Padilla's reputation to add the label of "enemy combatant" to the fact of his convictions and the conduct that led to them.

## V.

Finding Padilla's claims to be without merit, the judgment of the district court is

*AFFIRMED*.

---

it is insufficient to support standing. "[T]he Supreme Court has strongly suggested, without deciding, that where an effect on reputation is a *collateral* consequence of a challenged sanction, it is insufficient to support standing." *McBryde*, 254 F.3d at 57 (citing *Spencer v. Kemna*, 523 U.S. 1, 16-17 n.8 (1998)).